ROBERT ROY MARTINEZ
PRO SE
1119 Sequoia Ave.
Fowler, California 93625
Tel:(559)834-2735
Cell:(559)905-3128




**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

SPECIFIC JURISDICTION FEDERAL QUESTION

ROBERT ROY MARTINEZ, an individual;

Plaintiff

vs.

BANK OF AMERICA CORPORATION, a Corporation;
BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING;
COUNTRYWIDE FINANCIAL CORPORATION a Corporation;
COUNTRYWIDE HOME LOANS SERVICING LP;
AMERICA'S WHOLESALE LENDER;
QUALITY LOAN SERVICE CORPORATION; a Corporation;
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.;
FEDERAL HOME LOAN MORTGAGE COPORATION; a Corporation

Defendants

Case No:

1:11 CV 02061 AWI GSA

AMENDED PLAINTIFFS' COMPLAINT FOR DAMAGES;

1. Rescission – Mistake - Void Agreement
2. Fraudulent Concealment;
3. Intentional Misrepresentation;
4. Negligent Misrepresentation;
5. Invasion of Constitutional Right to Privacy;
6. Injunctive Relief for Violation of Civil Code § 2923.5;
7. Wrongful Foreclosure: Violation of Civil Code § 2924

Demand for jury trial

PRELIMINARY STATEMENT

1. This lawsuit is being filed because of Defendants deceptive, wrongful, fraudulent, and tortuous conduct that is intended to deprive Plaintiff of my rights and remedies for the fraud and misrepresentations perpetrated upon a disabled individual.

A. As a result, Plaintiff lost equity, credit, life savings, and other personal security.

B. Countrywide (AKA) Americas Wholesale Lender systematically destroyed the State of California's home values by inflating the appraisals as evidenced with Plaintiffs own appraisal of subject property located at 1119 Sequoia Avenue Fowler, California 93625. Plaintiffs appraisal shows an incomplete picture of my home, also lists it as a four bedroom when it is actually a three bedroom.

C. Defendants' misrepresentations have continued, including, Bank of America's robo signing, as proof is in their California Declaration notice dated October 5th 2011, that wrongfully states, tried with due diligence to contact the borrower in accordance with California Civil Code Section 2923.5. Plaintiff is and has been listed in all of the local phone directories, including on the internet. Another attempt to deprive Plaintiff of my legal rights.

D. Defendants' continue to demand payment and to foreclose on Plaintiff, despite the fact that : 1. Defendants do not have proof that they own the note and deed of trust they seek to enforce, on the contrary the copy of a manufactured note that the Defendant claims to be valid is not, because the signature is other than Plaintiff (Robert R. Martinez). I Plaintiff, do hold in my possession the original note. 2. There is evidence that Defendants do not own the note and deed of trust

they enforce and seek to enforce and based thereon, Plaintiff alleges that they do not; and, 3. whether or not they can demonstrate ownership of the note and deed of trust, Defendants lack the legal right to enforce the foregoing because they have not complied with disclosure requirements intended to assure mortgages are funded with monies obtained lawfully.

2. Countrywide has asserted in its securities filings that it sold its mortgages. Defendant has no evidence that they have re-acquired Plaintiffs note or deed of trust.

3. Plaintiff believes and thereon allege that Defendants have made demand for payment on the Plaintiff with respect to Plaintiffs property at a time when Defendants are incapable of establishing ( and do not have any credible knowledge regarding ) who owns the promissory note Defendants are purportedly servicing. Plaintiff believes and thereon allege that because Defendants are not the holders of Plaintiffs note and deed of trust and are not operating under a valid power the current holders of the note and deed of trust, Defendants may not enforce the note or deed of trust.

4. The Defendants include some of our leading financial institutions on which Plaintiff thought I could rely and did rely on. But, I was wrong. As is clear from the mounting number of federal and state enforcement actions against Defendants, it is now widely recognized that they have done very bad things with regard to their mortgage business.

5. Mortgage Electronic Registration Systems Inc., (AKA) MERSCORP, Inc. (MERS) operates an electronic registry designed to track servicing rights and the ownership of mortgages. MERS is sometimes named as the "nominee" for the beneficiary, and at other times MERS is named as the "beneficiary" of the deed of trust on behalf of unknown

persons. When a loan is transferred among MERS members, MERS purports to simplify the process by avoiding the requirement to re-record liens and pay county recorder filing fees.

6. MERS claims to be the owner of the security interest indicated by the mortgage transferred by lenders, investors and their loan servicers in the county land records which lowers costs for lenders and consumers by reducing county recording revenues from real estate transfers and provides a central source of information and tracking for mortgage loans.

7. Based upon published reports, including the MERS website, Plaintiff believes and thereon allege, MERS does not; 1. take applications for, underwrite or negotiate loans; 2. make or originate mortgage loans to consumers; 3. extend credit to consumers; 4. service mortgage loans; or 5. invest in mortgage loans.

8. MERS is used by Defendants to facilitate the unlawful transfers of mortgages, unlawful pooling of mortgages and the injection into the United States banking industry of unsourced (i.e., unknown) funds, including, without limitation, improper off-shore funds. Plaintiffs are informed and thereon believe and allege that MERS has been listed as beneficial owner of more than half the mortgages in the United States. MERS is improperly listed as beneficiary of Plaintiffs mortgage.

9. Despite being used by Defendants in California, MERS' status in California was suspended on May 31, 2002 and its agent for service of process resigned on March 25, 2009. No action taken by MERS in or with respect to the State of California, property in the State of California, individuals in the State of California or legal persons in the

State of California since May 21, 2002 is a valid or enforceable action.

PARTIES

AMERICAS WHOLESALE LENDER / COUNTRYWIDE / BANK OF AMERICA, NA. as owner or originator.

Plaintiff

10. ROBERT ROY MARTINEZ I am a disabled individual residing in the State of California, with property located at 1119 Sequoia Ave. Fowler, CA. 93625. I Robert R. Martinez allegedly obtained a mortgage from Americas Wholesale Lender / Countrywide in April 2006, It was a no documentation, non-affordable, predatory loan. In 2008 Bank of America purchased Americas Wholesale Lender / Countrywide.

Relation of the Defendants

11. Countrywide Financial was ("Countrywide") one of the country's largest originators of residential mortgages between 2001 and 2008, when the company was merged with a subsidiary of Bank of America. Many of the mortgages originated by Countrywide were securitized and placed into trust. Interests in the trust were then sold off to investors. Countrywide is considered a "seller" of the assets contained in trust and benefited financially from the sale of interest in the trust. In fact Countrywide likely gained more from the sale of interest in the trust than it paid out to its mortgagors.

12. Bank of America completed its acquisition of Countrywide in July 2008 despite the FBI's ongoing investigation of Countrywide for fraud beginning in March 2008. Bank of America was fully aware of the wrongdoing of Countrywide at the time of the

Merger.

13. Bank of New York Mellon (BNYM) is servicing as trustee for most if not all of the trusts into which mortgages originated by Countrywide were placed. In fact BNYM is acting as a trustee for many of the residential mortgage backed securities (RMBS) trusts.

14. According to a post on a Financial Times website (ft,com/alphaville), a BNYM representative stated the following in a conference call regarding its third quarter earnings:

15. "Before I leave Issuer Services, I want to comment on the role of trustees for asset-backed securitization. What we do as trustee is fairly straightforward. For most deals, we also act as a documentation – excuse me. As a trustee what we do is receive cash, and then we pay that cash on to the bondholders. For most deals we also act as a document custodian, where we receive the loan files and report to the servicers and originators if the files are incomplete. We have good agreements that limit our role, so we don't foresee liability related to the recent foreclosure issues."

16. The post further posts BNYM was the biggest trustee for US asset-backed debt as of late 2008, according to Thompson Reuters data.

17. According to a report published on the Moody's website in 2003:

18. "In a securitization, the securitized assets are no longer the property of their originator. The assets are typically transferred to a special purpose vehicle, which is legally separate from the originator. However, the originator is often also the servicer, and in that capacity is responsible for collecting the payments made by obligors on

behalf of investors. Collections on the securitized assets are deposited to a segregated trust account that is held by the transaction's trustee. . . .

19. Besides collecting payments on the securitized assets, the servicer is responsible for tracking the performance of the receivables and, in many cases, calculating the distribution of transaction cash flows. For example, in an auto loan securitization, the servicer calculates the amount of interest and principal to be distributed to holders of the various tranches of debt issued by the trust. The servicer reports repossessions, delinquencies and losses on the receivables and calculates ratios relating to any performance triggers that were included in the transaction. The servicer also directs transaction cash flows to any reserve accounts that might be held by the trustee as credit enhancement for investors. The servicer is responsible for notifying the trustee if any performance triggers have been breached. . . ."

20. It is clear from the above description of the role of the trustees and servicers of mortgage-backed securities, that the trustee fills the role of the noteholder (working on behalf of the investors who purchased the pooled loans) and the servicer words at the behest of the trustee to enforce the terms of the loan.

21. Plaintiff is informed and believed that the other originating defendants as described under the parties sections are similarly situated with Countrywide and will be included in any allegations herein directed toward Countrywide.

22. At all times material hereto, all Defendants operated through a common plan and scheme designed to conceal the material facts set forth below from Plaintiff. From the California public and from regulators, either directly or as successors-in-interest for

others of the Defendants. The concealment was completed, ratified and/or confirmed by each Defendant herein directly or as a successor-in-interest for another Defendant, and each Defendant performed the tortuous acts set forth herein for its own monetary gain and as a part of a common plan developed and carried out with the other Defendants, or as a successor-in-interest to a Defendant that did the foregoing.

23. Plaintiffs believe and thereon allege that the agents and co-conspirators through which the named Defendants operated included, without limitation, financial institutions and other firms that originated loans on behalf of Countrywide or BofA. These institutions acted at the behest and direction of the Countrywide Defendants, or agreed to participate – knowingly or unknowingly – in the fraudulent scheme described herein.

24. Those firms originating loans that knowingly participated in the scheme are jointly and severally liable with Countrywide or BofA for their acts in devising, directing, knowingly benefiting from and ratifying the wrongful acts of the knowing participants. Upon learning the true name of such knowing participants, Plaintiff shall seek leave to amend this Complaint to identify such knowing participants as Doe Defendants.

25. For avoidance of doubt, such knowing participants include, without limitation, legal and natural persons owned in whole or in part by BofA or affiliates thereof, legal and natural persons owning directly or through affiliates financial interests in BofA; legal and natural persons directly or through affiliates acting pursuant to agreements, understandings and arrangements to share in the benefits of the wrongdoing alleged in this Complaint and knowingly, to at least some degree, committing acts and omissions in support thereof; and legal and natural persons knowingly, to at least some degree,

Acting in concert with the Defendants.

26. As to those legal and natural persons acting in concert without an express legal relationship with Defendants or their affiliates, on information and belief, BofA knowingly induced and encouraged the parallel acts and omissions, created circumstance-s permitting and authorizing the parallel acts and omissions, benefited there from and ratified the improper behavior, becoming jointly and severally liable therefore.

27. As to those legal and natural persons whose acts and omissions in support of the BofA scheme were unwitting, on information and belief, BofA knowingly induced and encouraged the acts and omissions, created circumstances permitting and authorizing the parallel acts and omissions, benefited there from and ratified the improper behavior, becoming liable therefore.

28. Countrywide's remaining operations and employees have been transferred to Bank of America, and Bank of America ceased using the Countrywide name in April 2009. on July 1, 2008, a New York Stock Exchange Form 25 was utilized to deregister and delist Countrywide's common stock, and on July 22, 2008 Countrywide filed Securities and Exchange Act of 1934, as amended.

29. Plaintiff is informed and believes, and thereon allege, that: 1) BofA and its wholly-owned and controlled subsidiaries are liable for all wrongful acts of Countrywide prior to the date thereof as the successor-in-interest to Countrywide, 2) BofA directly and through its subsidiaries and other agents sued herein as Does have continued the unlawful practices of Countrywide since October 31, 2007, including, without limitation thereof, writing fraudulent mortgages as set forth above and concealing wrongful acts that

occurred in whole or in part prior thereto, and 3) BofA and its subsidiaries are jointly and severally liable as alter egos and as a single, greater unified whole.

## GENERAL FACTS

30. The common facts herein include those facts set forth above in the prior sections of this Complaint.

31. Under California Civil Code § 1709 it is unlawful to willfully deceive another "with intent to induce him to alter his position to his injury or risk."

32. Under California Civil Code § 1710, it is a "deceit" to do any one or more of the following: 1) the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; 2) the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; 3) the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, 4) a promise, made without any intention of performing it.

33. Under California Civil Code § 1572, the party to a contract further engages in fraud by committing any other act fitted to deceive." At the time of allegedly entering into the note and deed of trust referenced herein with respect to Plaintiff, the Countrywide Defendants were bound and obligated to fully and accurately disclose: who the true lender and mortgage were.

34. That to induce Plaintiff to enter into the mortgage, the Defendants caused the appraised value of Plaintiffs home to be overstated.

35. That to disguise the inflated value of Plaintiffs home, Defendants were orchestrating the over-valuation of homes throughout Plaintiffs community.

36. That to induce a Plaintiff to enter into a mortgage, the Defendants dis-regarded their underwriting requirements, thereby causing Plaintiff's obligations under the mortgage, when the Defendants knew that was untrue. One way they systematically disregarded the underwriting requirements was through the use of the Granada Network, another fact which Defendants systematically failed to disclose to any California borrower.

a. That Defendants not only had the right to securitize and sell Plaintiff's mortgage to third-party investors, but that they specifically planned and intended to do so as to virtually all mortgages at highly-inflated and unsustainable values.

b. That as to the intended sales:

1) The sales would include sales to nominees who were not authorized under law at the time to own a mortgage, including, among other, MERS which according to its website was created by mortgage banking industry participants to be only a front or nominee to "streamline" the mortgage resale and securitization process:

2) Plaintiff's true financial condition and the true value of Plaintiff's home and mortgage would not be disclosed to investors to whom the mortgage would be sold;

3) Countrywide intended to sell the mortgage together with other mortgages as to which it also intended not to disclose the true financial condition of the borrowers or the true value of their homes or mortgages;

4) The consideration to be sought from investors would be greater than the actual value of the said note and deed of trust; and

5) The consideration to be sought from investors would be greater than the income stream that could be generated from the instruments even assuming a 0% default rate thereon;

c. That the mortgage would thereby be used as part of a scheme by which the Defendants would bilk investors by selling collateralized mortgage pools at an inflated value.

d. That, at the time they did the foregoing, the Defendants knew the foregoing would lead to a liquidity crisis and the likely collapse of Countrywide;

e. That the Defendants also knew the foregoing would lead to grave damage to Plaintiff's property value and thereby result in Plaintiff's loss of the equity Plaintiff invested in my house in the amount of nearly two hundred thousand dollars, as well as damaging Plaintiff's credit rating, thereby causing Plaintiff additional severe financial damage; and

f. That the Defendants knew at the time of making each loan, but did not

disclose to Plaintiff, that entire communities would become "ghost-town-foreclosure-communities" after a domino effect of foreclosures hit them.

g. That the Defendants did not have documents competent to establish that they are holders in due course of the note and deed of trust, or otherwise operating under a valid power of attorney with respect thereto to support the right to enforce the note and deed of trust against Plaintiffs property.

37. That the Defendants did not properly source their funds, or report the source of their funds in compliance with all requirements.

38. If the Plaintiff had later learned the truth, Plaintiff would have rescinded the loan transaction under applicable law. Instead, Plaintiff reasonably relied on the deceptions of the Defendants in originating my loan that they approved when I told Defendants that I did not think I could afford the payments.

39. After entering into the transactions with Plaintiff herein as alleged herein, the Defendants, with the assistance of the other Defendants herein, sold in securities transactions the note and deed of trust pertaining to Plaintiffs property. The sales:

a. Included sales to nominees who were not authorized under law at the time to own a mortgage, including, among others, MERS;

b. Involved misrepresentations by Defendants to investors and concealment from investors of Plaintiffs true financial condition and the true value of Plaintiffs home and mortgage;

c. Involved misrepresentations by Defendants to investors and concealment

from investors of the true financial condition or other borrowers and the true value of their homes and mortgages also involved in the pools;

d. Were for consideration greater than the actual value of the said notes and deeds of trust;

e. Were for consideration greater than the income stream that could be generated from the instruments even assuming a 0% default rate thereon; and

f. Were part of a scheme by which the Defendants bilked investors by selling collateralized mortgage pools at an inflated value.

40. Defendants hid from Plaintiff that Defendants were engaged in an effort to increase market share and sustain revenue generation through unprecedented expansions of their underwriting guidelines, taking on ever-increasing credit risk.

41. MERS Improperly Separates the Note and Deed of Trust.

42. MERS is a Delaware corporation formed in 1993 by several large participants in the real estate mortgage industry. As alleged above in Paragraph 25, MERS has not been permitted to do business in California since 2002 and all of its acts since that date are void. MERS has one shareholder, MersCorp Inc.

43. MERS operates an electronic registry designed to track servicing rights and the ownership of mortgages. MERS is named as the "nominee for lenders and acts as a document custodian. According to statements of a BNYM representative quoted above, this is the job of the trustee of the pooled mortgages. When a loan is transferred among MERS member, MERS simplifies the process by avoiding the requirement to re-record

liens and pay county recorder filing fees.

44. MERS claims to be the owner of the security interest by the mortgages transferred by lenders, investors and their loan services in the county land records. MERS claims its process eliminates the need to file assignments in the county land records which lowers costs for lenders and consumers by reducing county recording revenues from real estate transfers and provides a central source of information and tracking for mortgage loans.

45. MERS principal place of business is Vienna, Virginia. Its national data center is located in Plano, Texas. At present, MERS appears to serve as nominee for more than 65 million mortgages based on published reports.

46. Based upon published reports, including the MERS website, Plaintiff believes and thereon allege that MERS does not; 1) take applications or, underwrite, or negotiate mortgage loans; 2) make or originate mortgage loans to consumers; 3) extend credit to consumers; 4) service mortgage loans; or 5) invest in mortgage loans.

47. Nationwide, there are courts requiring banks that claim to have transferred mortgages to MERS to forfeit claim to repayment of such mortgages.

48. MERS operations undermines and eviscerate long-standing principles of real property law, such as the requirement that any person who seeks to foreclose upon a parcel of real property; 1) be in possession of the original note and mortgage; and 2) possess a written assignment giving it rights to the payments due from the borrower pursuant to the mortgage and note.

Many of the mortgages issued by defendants include intentionally ambiguous provisions pertaining to MERS. These standardized mortgages are crafted to allow

Defendants to situationally modify their positions, as demonstrated by the following language from some of the underlying documents used in mortgages involving MERS;

49. MERS is Mortgage Electronic Registration System, Inc.; 1) MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns; 2) MERS is the mortgage under this security instrument; 3) MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679 MERS.

50. TRANSFER OF RIGHTS IN THE PROPERTY: This Security Instrument secures to Lender: 1) the repayment of the Loan, and all renewals, extensions and modifications of the Not; and 2) the performance of Borrowers covenants. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (Solely as nominee for Lender and Lenders successors and assigns) and to the successors and assigns of MERS, the following described property in the County of [________].

51. At all material times, MERS was unregistered and unlicensed to conduct mortgage lending or any other type of real estate or loan business in the State of California and has been and continues to knowingly and intentionally improperly record mortgages and conduct business in California and elsewhere on a systematic basis for the benefit of the Defendants and other lenders;

52. Following a crescendo of rulings that MERS lacks the authority to foreclose on February 16, 2010 MERS issued an Announcement to All MERS Members advising them;

MERS is planning to shortly announce a proposed amendment to Membership

> Rule 8. The proposed amendment will require Members to not foreclose in MERS' name. Consistent with the Membership Rules there will be a 90-day comment period on the proposed Rule. During this period we request that Members do not commence foreclosures in MERS' name.

53. The Announcement also instructed MERS' members to cease executing assignments and other documents, except pursuant to new procedures being developed.

54. Based upon published reports, other litigation and the investigations of Plaintiffs' counsel, Plaintiff believes and thereon allege that MERS has been used by Defendants to facilitate the unlawful transfers of mortgages, unlawful pooling of mortgages and the injection into the United States banking industry of improper off-shore funds.

55. The Bank Defendants do not comply with TILA effective May 20, 2009, pursuant to an amendment to the Federal Truth in Lending Act (TILA), transferors of mortgage loans must disclose to the mortgagor the identity of any transferees. The notice must include the identity, address and telephone number of the new creditor; the date of the transfer; how to reach an agent or party having authority to act on behalf of the new creditor; the location of the place where transfer of ownership of the debt is recorded; and any other relevant information regarding the new creditor.

56. Section 404 of TILA, NOTIFICATION OF SALE OF TRANSFER OF MORTGAGE LOANS, provides;

> IN GENERAL Section 131 of the Truth in Lending Act (15 U.S.C. 1641) is amended by adding at the end the following·
>
> g. NOTICE OF NEW CREDITOR

1) IN GENERAL- In addition to other disclosures required by this title, not later than assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer, including-

i. the identity, address, telephone number of the new creditor;

ii. the date of transfer;

iii. how to reach an agent or party having authority to act on behalf of the new creditor;

iv. the location of the place where transfer of ownership of the debt is recorded; and

v. any other relevant information regarding the new creditor

2) DEFINITION- As used in this subsection, the term 'mortgage loan' means any consumer credit transaction that is secured by the principal dwelling of a consumer.'

3) PRIVATE RIGHT OF ACTION- Section 130(a) of the truth in Lending Act (15 U.S.C. 1640(A) is amended by inserting "subsection (f) or (g) of section 131, after "section 125."

57. The amendment above was signed into law as part of the Helping Families Save Their Homes Act of 2009, with immediate effect from the President's signature. The purpose of the amendment is to ensure that homeowners know who owns their mortgages and to prevent lenders from standing behind nominees. The requirement for "any other

Relevant information" is particularly strong, underscoring the strong Congressional intent for complete disclosure. Using MERS to foreclose may violate 15 U.S.C. § 1641.

58. Remedies for TILA violations include rescission, damages and equitable relief. 15 U.S.C. § § 1635-1640.

59. This Complaint does not allege a cause of action for breach of TILA. Rather, Defendants actions and omissions are relevant to the causes of action alleged herein for the following reasons: 1) such actions and omissions and the potential consequences thereof were concealed from Plaintiff, 2) such actions and omissions are relevant to determining the availability of punitive damages, and 3) such actions and omissions are relevant to assessing whether there is liability under the California Unfair Competition law which is the basis for the seventh cause of action herein.

FIRST CAUSE OF ACTION

Rescission-Mistake-Void Agreement

(By Plaintiff, Against All Defendants)

60. Plaintiff re-allege and incorporate by reference all paragraphs of this complaint as though fully set forth herein.

61. The Restatement (Second) of Contract, § 17 states that "the formation of a contract requires a bargain in which there is a manifestation of mutual assent. . ." American Law Institute, Restatement (Second) of Contracts, § 17(1).

62. The bargain between the parties is often referred to as the "meeting of the minds." See, e.g., American Law Institute, Restatement (Second) of Contracts, § 17, comment 2.

63. The California Forth District Appellate Court has held that a lack of meeting of the minds, a mistake as to fact, can justify a rescission of the contract. "A mutual mistake, whether of fact or law, which affects an essential element of the contract and is harmful to one of the parties, is subject to rescission by the party harmed." Guthrie v. Times-Mirror Co., 51Cal.App.3d 879 (1975).

64. The mistake or missing of the minds does not have to be mutual. A single party mistaken justifies the voiding or rescinding of the contract when the mistake is known to the non-mistaken party.

65. The Restatement (Second) of Contracts, § 153 states;

> "Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and
>
> a. The effect of the mistake is such that enforcement of the contract would be unconscionable, or
>
> b. The other party had reason to know of the mistake or his fault caused the mistake.

66. Plaintiff entered an eminent default Loan, called a no documentation, no asset Loan on the mistaken belief that I would have a borrower/lender relationship.

67. The Lenders knew the Loan was setup to fail, they knew there would be no borrower/lender relationship.

68. The mistake was not a future contingency, but a reality present at the contract

Formation: the Defendants knew the securitization of the conduit Loans would occur with certainty and they knew no borrower/lender relationship was contemplated or planned as a result of the Loan.

69. It would be unconscionable for the Defendants, having withheld material information regarding the Loan from Plaintiff, to still receive the benefits of the loans.

70. The Defendants knew that the Plaintiff did not understand that the securitization of the Loan would destroy the lender/borrower relationship.

71. Based on the material mistake in the formation of my contract, Plaintiff is, therefore, entitled to an order of this Court rescinding the Loan and/or declaring the Loan void, invalid, and unenforceable.

72. In addition, I request restitution and damages in an amount in excess of $75,000, the specific amount to be determined at trial.

SECOND CAUSE OF ACTION

(Fraudulent Concealment-Against All Defendants)

(By Plaintiff)

73. Paragraph 1 through 72 and the paragraphs following this cause of action are hereby incorporated by reference as though fully set forth herein.

74. Defendants had exclusive knowledge not accessible to Plaintiff of material facts pertaining to its mortgage lending activities that it did not disclose to Plaintiff at the time it was entering into contracts with Plaintiff. As more fully alleged herein, these facts included false appraisals, violation of Defendants' underwriting guidelines, the intent to

sell Plaintiffs' mortgage above their actual values to bilk investors and knowledge that the scheme would result in a liquidity crisis that would gravely damage Plaintiff.

75. Further, in connection with entering into contracts with Plaintiff, Defendants, made partial (through materially misleading) statements and other disclosures as to their prominence and underwriting standards in the public releases, on their web site, in their literature and at their branch offices. However, Defendants suppressed material facts relating thereto as set forth above. Countrywide knew that the mortgages would be "pooled," and "securitized sale.

76. Countrywide also knew that within a foreseeable period, its investors would discover that Countrywide's mortgages could not afford their loans and the result would be foreclosures and economic devastation. It was the movie The Sting in real lives and with people like Plaintiff, that our homes were our only asset.

77. Countrywide was more dependent than many of its competitors on selling loans it originated into the secondary mortgage market, an important fact it disclosed to investors. Countrywide expected that the deteriorating quality of the loans that Countrywide was writing, and the poor performance over time of those loans, would ultimately curtail the company's ability to sell those loans in the secondary mortgage market.

78. Countrywide failed to disclose, that Countrywide's business model was unsustainable. In fact, the credit risk that Countrywide was taking was so alarming to Mozilo that he internally issued a series of increasingly dire assessments of various Countrywide loan products and the risks to Countrywide in continuing to offer or hold those loans, while at the same time, Countrywide executives continued to make public

statements obscuring Countrywide's risk profile and attempting to differentiate it from other lenders.

79. Despite their awareness of, and severe concerns about, the increasing risk Countrywide was undertaking, Countrywide hid these risks from the borrowers, potential borrowers and investors. Defendants misled borrowers, potential borrowers and investors by failing to disclose substantial negative information regarding Countrywide's loan products, including:

a. The increasingly lax underwriting guidelines used by the company in originating loans; The company's pursuit of a "matching strategy in which it matched the terms of any loan being offered in the market, even loans offered by primarily subprime originators;

b. The high percentage of loans it originated that were outside its own already widened underwriting guidelines due to loans made as exceptions to guidelines;

c. Countrywide's definition of prime" loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality;

d. The high percentage of Countrywide's subprime originations that had a loan to value ratio of 100%, for example, 62% in the second quarter of 2006; and

e. Countrywide's subprime loans had significant additional risk factors, beyond the subprime credit history of the borrower, associated with

increased default rates, including no documentation, stated income, piggyback second liens, and LTVs in excess of 95%.

80. Countrywide knew this negative information from numerous reports they regularly received and from emails and presentations prepared by the company's chief credit risk officer. Defendants nevertheless hid this negative information from the public, including Plaintiff.

81. Plaintiff did not know the concealed facts Defendants intended to deceive Plaintiff. As described herein, that deception was essential to their overall plan to bilk investors, trade on inside information and otherwise pump the value of Countrywide stock.

82. Countrywide was one of the nation's leading providers of mortgages. It was highly regarded and by dint of its campaign of deception through securities filings, press releases, web site and branch offices, Countrywide had acquired a reputation for performance and quality underwriting. As a result, Plaintiff reasonably relied upon the deception of the Countrywide Defendants.

83. Property values have precipitously declined and continue to decline, gravely damaging Plaintiff by materially reducing the value of my primary residence, depriving me of access to equity lines, second mortgages and other financings previously available based upon ownership of a primary residence in California, in numerous instances leading to payments in excess of the value of my property, thereby resulting in payments with no consideration and subjecting me to reduced credit scores (increasing credit card

and other borrowing costs) and ultimately leading to Plaintiff's bankruptcy, reducing credit availability to null.

84. Without limiting the damages as described in this Complaint, Plaintiffs damages arising from this Cause of action also include loss of equity in my house costs and expenses related to protecting myself, reduced credit score, unavailability of credit, increased cost of credit, reduced availability of goods and services tied to credit ratings, increased cost of those services, as well as fees and costs, including, without limitation, attorneys fees and costs.

85. To this day, Defendants profess willingness to modify Plaintiffs' loans in accordance with law, but nonetheless they persist to this day in their secret plan to use Indian or other offshore servicing companies to deprive Plaintiff of my rights.

86. As a result of the foregoing, Plaintiffs damages herein are exacerbated by a continuing decline in residential property values and further erosion of my credit records. Defendants' concealments, both as to their pervasive mortgage fraud and as to their purported efforts to resolve loan modifications with Plaintiff, are substantial factors in causing Plaintiff harm as described in this Complaint.

87. Defendants acted outrageously and persistently with actual malice in performing the acts alleged herein and continue to do so. Accordingly, Plaintiff is entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

THIRD CAUSE OF ACTION

(Intentional Misrepresentation-Against All Defendants)

(By Plaintiff)

88. Paragraph 1 through 87 and the paragraphs following this cause of action are hereby incorporated by reference as though fully set forth herein.

89. On information and belief the entire BofA scheme was to get loans against Plaintiffs' real estate and immediately transfer the realty to the pool to immediately transfer it to the investors overseas.

90. Consistent with discussions in this action, as Plaintiff continues to collect information regarding their reliance upon Defendants misrepresentations, Plaintiff will seek leave to amend to allege such supplemental allegations.

91. The campaign of concealment, misinformation and partial information described above in the INTRODUCTION to Ex. 1, attached hereto, throughout the section captioned GENERAL FACTS in Ex. 1, and in the First Cause of Action was intended to be repeated and broadly disseminated through the media, analyst reports and individual communications, and it was. It was intended to become part of the well-understood givens among homeowners and prospective homeowners seeking mortgages, and it did become part of the lexicon of home ownership and mortgage choices. The campaign of disinformation and the manifestation of that campaign described in the preceding paragraphs of this Second Cause of Action succeeded.

92. Plaintiff relied upon the misrepresentations and entered into a mortgage with Countrywide Defendants. The misrepresentations were made with the intention that

Plaintiff relied on thereon. It was important to Countrywide that Plaintiff relied on its misrepresentations so that Plaintiff would come to a false understanding as to the nature of Countrywide's business. The forgoing misrepresentations were specifically intended to convince Plaintiff to take a mortgage from Countrywide Defendants.

93. By reason of Countrywide's prominence and campaign of deception as to its business plan and the relationship of trust developed between each of the Defendants and Plaintiff. Plaintiff was justified in relying upon Defendants representations. As a result of relying upon the foregoing misrepresentations, Plaintiff allegedly entered into a mortgage contract with Countrywide Defendants.

94. In fact, the home appraisal was inflated by Appraiser James L. Moore who appraised 1119 Sequoia Ave. Fowler, CA. 93625 as a four bedroom when it is actually a three bedroom.Mr. Moore appraised many, many of the homes in Plaintiff's development Countrywide did not utilize quality underwriting processes, with no documentation, no income verification. Countrywide's financial condition was not sound, but was a house of cards ready to collapse, as Countrywide well knew, but Plaintiff did not.

95. As a result of Countrywide's scheme described herein, Plaintiff could not afford the Counrtrywide mortgage when Plaintiff's life savings ran out. Plaintiff could not refinance or sell my residence without suffering a loss of my equity investment,

96. As a result of the foregoing, Plaintiff has lost all of the equity invested in my house, and suffered thru Bankruptcy reduced credit rating and increased borrowing costs, among other damages described herein.

97. Plaintiffs reliance on the misrepresentations of the Countrywide Defendants

appraiser, all directed and ratified by the Countrywide Defendants, was a substantial factor in causing Plaintiffs' harm.

98. Financing and Loan Approval under original contract state's, If Buyer fails to obtain loan approval as provided in Paragraph 7.2 (b) by the Loan Contingency Date, and Buyer is not otherwise in default under this Purchase Agreement, either Buyer or Seller may terminate this Purchase Agreement and cancel Escrow, and Buyer shall receive a refund of the Deposit.

99. Defendants loose lending practices (no documentation, no income loans) caused the majority of Loans to be approved when most should have been denied such as Plaintiff's, I was approved without employment, and limited income.

100. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs

101. damages arising from the matters complained of in this Cause of Action also include loss of equity in my house, costs and expenses related to protecting myself, reduced credit score, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs.

102. Plaintiff's reliance on the representations made by BofA and Countrywide Defendants were a substantial factor in causing Plaintiff harm. Plaintiff is entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

FOURTH CAUSE OF ACTION

(Negligent Misrepresentation-Against All Defendants)

(By Plaintiff)

103. Paragraphs 1 through 102 and the paragraphs following this cause of action are hereby incorporated by reference as though fully set forth herein.

104. The BofA, Countrywide Defendants, had reasonable grounds of believing such representations to be true at the time: The representations were instructed to be made, as to those Defendants instructing other to make representations, or 2) at the time the representations were made, as to those Defendants making representations and those Defendants instructing others to make the representations, or 3) at the time the representations were otherwise ratified by the Countrywide Defendants.

105. Such representations, fully set forth in the Second Cause of Action and previous sections of this Complaint, were not true.

106. BofA the Countrywide Defendants intended that Plaintiff rely upon those misrepresentations. As described herein, Plaintiff reasonably relied on those representations. By reason of Countrywide's prominence and campaign of deception as to its business plans and the relationship of trust developed between each of the Defendants and Plaintiff, Plaintiff was justified in relying upon Defendants' representations.

107. As a result of relying upon the foregoing misrepresentations, Plaintiff allegedly

entered into a mortgage contract with a Countrywide Defendant.

108. As a result of Countrywide's scheme described herein, Plaintiff could not afford my Countrywide mortgage, Defendant knew that when my savings was depleted I would not be able to make mortgage payments, as a result of the Countrywide scheme, Plaintiff could not refinance or sell my residence without suffering a loss of my equity.

109. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages as a result of the foregoing also include loss of equity in my house, costs and expenses related to protecting myself, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, and eventually bankruptcy.

110. Plaintiff is entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

FIFTH CAUSE OF ACTION

(Invasion of Constitutional Right to Privacy-Against All Bank Defendants)

(By Plaintiff)

111. Paragraphs 1 through 110 and the paragraphs following this cause of action are hereby incorporated by reference as though fully set forth herein.

112. The guarantee of privacy granted to each Californian is a special and unique right embedded in the very first clause of the California Constitution. Article I, § 1 of the California Constitution, which provides:

113. "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

114. The unauthorized disclosure of "private Information" (confidential, nonpublic personal information, including such information as social security numbers, dates of birth, property values, bank and credit card account numbers, an other personal information) is a fundamental violation of Californians' inalienable right to privacy. Plaintiff has a Constitutionally protected privacy interest and right in his Private Information.

115. Plaintiff provided Private Information to the Defendants as a requirement for obtaining a mortgage. Plaintiff had a reasonable expectation that the Defendants would preserve the privacy my Private Information.

116. Defendants directly and though their agents violated my privacy rights by disclosing the Private Information without my knowledge, authorization or consent. This unauthorized disclosure of private information is intrusive into the most private reaches of Plaintiff's life, and does not include information that is of a legitimate public concern. Possession of personal confidential information allows criminals to "breed" identities, that is, to obtain other forms of identification that may further enhance their ability to misuse another's identity. Social security numbers are among the most sought after and valuable items of personal information to an identity thief.

117. The average victim of unauthorized use of wrongfully disclosed personal confidential information spends approximately 600 hours and $1400 repairing his credit

once violated. Victims of identity theft also often suffer further financial loss from the denial of credit or utility services, increased difficulty in securing employment and housing, and higher insurance and credit rates. In some cases, an identity theft victim may even have a criminal record develop in his name. Further costs include increased medical problems, and impact on family and friends.

118. It is often the case that a victim will not discover that his or her Private Information has been stolen and misused until long after an identity theft has taken place, and then only when they are denied credit.

119. The California Constitution (Art. I, § 1) is self-executing and confers a right of action beyond the scope of the mere common law tort. See, e.g., Burt v. Orange (2004) 120 Cal.App.4th 273.284. Fundamental to privacy is the ability to control circulation of personal information. The proliferation of business records over which individuals have no control limits their ability to control their personal lives. Personal privacy is threatened by the information-gathering capabilities and activities of private business-and never more then when a financial institution that requires personal information to permit a consumer to buy a home and obtains it with the assertion and promise it will be safeguarded fails to safeguard that information.

120. On information and belief, Defendants began running credit checks on their borrowers to determine who was experiencing financial difficulties. These credit checks were outsourced, meaning that private data and other information was sent off-site. The goal was to develop information that could be used to further Defendants' fraud involving the sale of collateralized securities and also to improperly provide information

to those who already had purchased such collateralized securities in order to give Countrywide a tactical advantage ahead of other banks.

121. But, the real estate market collapsed so rapidly that Countrywide was caught in the middle of its scheme. The FBI then identified Countrywide employees for their role in the unlawful disclosure of private and confidential information. On information and belief, third parties unlawfully used the Private Information acquired from Countrywide thereby further damaging Plaintiff.

122. By reason of the conduct alleged herein, Defendants violated Plaintiff's constitutional right of privacy and Plaintiff has suffered special damages in an amount according to proof at trial.

123. Further, as a proximate and foreseeable result of Defendants' intentional disclosure of Plaintiffs' Private information, Plaintiff has suffered general damages-including pain and suffering and emotional distress-in an amount according to proof at trial.

124. Defendants conduct is willful, outrageous and pervasive, involving hundreds of thousands of California citizens. Not only did Defendants abuse Private Information, willfully fail to maintain the security of the Private Information, and then disclose it to third parties without permission, but they took no material steps to retrieve the Private Information, concealed the extent of the violations, and then embarked on a scheme to defraud this Court and the United States District Court for the Western District of Kentucky.

125. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs

damages as a result of the foregoing also include direct losses associated with identity theft and the losses associated with reduced credit scores, including, among others, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased cost of those services, as well as fees and costs, including, without limitations, attorneys' fees and costs.

126. Defendants act with actual malice by disclosing plaintiff's Private Information, failing to cure the same, concealing the magnitude of the problem, and then lying to the Kentucky Federal Court.

127. Plaintiff is entitled to exemplary and punitive damages in a sum according to proof and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

SIXTH CAUSE OF ACTION

(Injunctive Relief for Violation of Civil Code § 2923.5 – Against Defendants Bank of America Corporation, Bank of America, N.A., Quality Loan Service Corporation, - together the "Foreclosing Defendants".) (By Plaintiff Robert R. Martinez)

128. Paragraph 1 through 127 and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

129. Pursuant to California Civil Code, § 2923.5, the Defendants – and each of them - are prohibited by statute from recording a Notice of Default against the primary residential property of any Californian without first making contact with that person as required under § 2923.5 and then interacting with that person in the manner set forth in

detail under § 2923.5. An exception to this rule of law exists in the event the Defendants are unable with due diligence to contact the property owner.

130. With respect to Plaintiff in this cause of action, the realty that is the subject hereof was and is my primary residential dwelling within the meaning of § 2923.5.

131. The Defendants, and each of them, caused Notices of Default to be recorded against the primary residential property of the Plaintiffs name in this cause of action absent compliance with California Civil Code, § 2923.5. Included in the noncompliance, Defendants, and each of them, caused declarations to be recorded in the public records that were, each of them, false. This act also violates § 2923.5 and other California laws precluding the filing of false statements.

132. Plaintiff is entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

SEVENTH CAUSE OF ACTION

(Violation of Civil Code § 1798.82-Against All Bank Defendants)

(By Plaintiff)

133. Paragraphs 1 through 134 and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

134. The Defendants failed to timely disclose to Plaintiff the disclosure of my personal information as required under California Civil Code § 1798.82.

135. As a proximate result of the foregoing untimely disclosure by Defendants, the

Plaintiff was damaged as described in this Complaint. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages also include direct losses associated with identity theft and the losses associated with reduced credit scores, including, among others, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs. Plaintiff may recover damages under California Civil Code § 1798.84 according to proof and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

EIGHTH CAUSE OF ACTION

(Wrongful Foreclosure, Violation of Civil Code 2924 – Against Defendants, Bank of America Corporation, Bank of America, N.A., Quality Loan Service Corporation, and Mortgage Electronic Registration Systems, Inc. – together the "Foreclosing Defendants")

(By Plaintiff Robert R. Martinez)

136. Paragraphs 1 through 135 and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

137. Defendants have initiated foreclosure proceeding upon Plaintiff without any legal right to do so.

138. Because Defendants are not the holders of the note and deed of trust and are not operating under a valid power, Defendants do not have the right to proceed with the foreclosure proceedings that they are pursuing.

139. The note and deed of trust that Defendants are using to foreclose on Plaintiffs home are not the originals they are altered copies of copies, I demand that they produce the original note and deed of trust with Plaintiffs wet ink signatures, the signatures on both the note and deed of trust are not Plaintiff's Robert R. Martinez, this is a fact that I Plaintiff can prove in court, because I do have the original documents.

140. Uniform Commercial Code – Article 3, § 3-302. Holder in Due Course. (a)-(2) subsection (iv) without notice that the instrument contains an unauthorized signature or has been altered, Public filling or recording of a document does not of itself constitute notice of a defense, claim in recoupment, or claim to the instrument.

141. BofA admits that it does not have Plaintiff's original note nor deed of trust therefore the assignment of the deed of trust and note are invalid. To perfect a transfer, the transferor should physically deliver the note to the transferee. Without a physical transfer, a sale of the note could be invalidated as a fraudulent conveyance (under Civil Code § 3440), and a transfer in pledge could be invalidated as an unperfected (under Com Code §§ 9313-9314). (California Mortgages and Deeds of Trust, and Foreclosure Litigation, by Roger Bernhardt, Fourth Edition, section 1.26) One without a pecuniary interest in the Mortgage Loan is not an oblige under the debt and, thus, has no legal standing to foreclose ab initio. (Watkins v. Bryant (1891) 91C 492,27 P 77).

142. Plaintiffs obligation of this mortgage debt was discharged though chapter 7 bankruptcy, Defendants were notified of the meeting of creditors by bankruptcy Trustee J. Salven. On 08/26/10 no creditors appeared in court, and on 11/01/10 all

of Plaintiffs debts were discharged by operation of law, therefore any attempt by creditors to collect or charge additional late fees would violate section 524 of the bankruptcy code. Defendant BofA has continued to add late fees, and attempted to collect Plaintiffs discharged debt.

143. Defendants continue foreclosure proceedings after Plaintiff put Defendants on notice to cease, because of the foregoing defects.

144. Based upon the assertion (Express or Implied) that they did not have to prove they held the note or deed of trust and did not have to prove they had a power of attorney with respect to the note and deed of trust, Defendants proceeded to foreclose. Defendants thereby acted outrageously and persistently with actual malice in performing the acts alleged in this cause of action. Accordingly, Plaintiff is entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them as follows:

1. General, special and exemplary damages according to proof under the First, Second, third, Forth, Fifth, and Eighth Causes of Action;
2. Statutory relief according to proof under the Sixth and Seventh Causes of Action;

3. Temporary, preliminary, and permanent injunctive relief under the Fifth, and Sixth Causes of Action;

4. On all causes of action, for costs of suit herein;

5. On all causes of action, for pre- and post-judgment interest;

6. On all causes of action for which attorney's fees may be awarded to the governing contract, by statute or otherwise, if Plaintiff decides to retain a attorney; and

7. On all causes of action, for such other and further relief as this Court may deem just and proper.

DEMAND FOR JURY TRIAL

Plaintiff hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: November 14, 2011

Respectfully submitted,

ROBERT ROY MARTINEZ PRO SE

ROBERT ROY MARTINEZ

1119 Sequoia Ave.
Fowler, CA 93625
Tel: (559) 834-2735
Cell: (559) 905-3128
Information provided by,
United Foreclosure Attorney Network
UFANLaw.com